**PATRONS OXFORD MUTUAL
INSURANCE CO.**

v.

**Norman and Julia MAROIS.**

Supreme Judicial Court of Maine.

Argued Jan. 31, 1990.
Decided April 2, 1990.

William J. Kelleher (orally), Augusta, for plaintiff.

Peter B. Bickerman (orally), Steven T. Blackwell, Lipman & Katz, Augusta, for defendant.

James Tierney, Atty. Gen., Dennis Harnish, Asst. Atty. Gen., Augusta, amicus curiae.

Before WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

HORNBY, Justice.

In this case we consider whether a special multi-peril policy covers a polluter's expense in responding to state-ordered clean-up demands. The pollution resulted from leaking underground tanks located on the insured's property. We conclude that insurance contract language providing coverage for amounts the insured is "legally obligated to pay as damages" does not cover expenses the insured incurs in meeting state clean-up demands. We also hold that the duty to defend the insured against "any suit ... seeking damages" does not include an administrative proceeding that can award no damages.

Mr. and Mrs. Marois owned S & M Market in South China. By agreement Lathe Fuel Company owned and operated three underground gasoline storage tanks on the premises. Traces of gasoline were found in wells in the area around S & M Market. When all three gasoline tanks were removed in October of 1985, at a time when Patrons Oxford Mutual Insurance Co. was insuring the Maroises, holes were discovered in two of the tanks. The Department of Environmental Protection (DEP) issued a clean-up order directed to Lathe Fuel and the Maroises, finding them to be "responsible parties" under 38 M.R.S.A. § 562(10) (1989).[1] Both Lathe and the Maroises appealed. Lathe Fuel subsequently consented to an Administrative Clean-up order. The Maroises, however, pursued their appeal to the Board of Environmental Protection. The Board ordered the Maroises to give Lathe Fuel access to their premises so that Lathe Fuel could comply with the consent order. It further directed that if Lathe Fuel's measures did not prevent migration of contaminated ground water and restore water quality, the DEP could order the Maroises to submit a remedial action plan proposing a method to prevent migration of contaminated ground water, restore ground water quality levels and provide for the restoration or replacement of water supplies that were contaminated.

The only expense the Maroises have incurred to date is legal defense costs arising out of the DEP proceeding. No claims for damages have been made by neighbors or other third parties. Patrons Oxford brought this declaratory judgment action seeking a declaration that it owed no duty to defend the Maroises before the Department of Environmental Protection, and that it is not obliged to pay for remedial actions the State may order the Maroises to undertake.

On stipulated facts, the Superior Court (Kennebec County, *Alexander, J.*) ruled that Patrons Oxford must indemnify the Maroises for amounts they incur in restoring or replacing third parties' water systems and amounts the Maroises pay to third parties to reimburse their losses. The court further declared that the insurer must defend any claims brought against the Maroises by such third parties in any administrative or judicial forum, but that it need not defend the Maroises in the compliance action brought by the DEP. Drawing a line between on-premises and off-premises activity, the court held that Patrons Oxford need not indemnify the Maroises for any repairs, restoration or replacement they are ordered to undertake on their own property.

The Maroises have appealed. The insurance company has not cross-appealed. On reasoning somewhat different from that of the Superior Court, we affirm the judgment. In light of the fact that the parties, the Attorney General appearing as amicus curiae and the abundant case law in this area have highlighted the environmental policy issues affected by this question of coverage, we begin by observing that our role here is simply to determine the meaning of a private contract between these parties, not to foster or retard environmental goals. *Accord, Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wash.2d 869, 872 n. 1, 784 P.2d 507, 510 n. 1 (1990); *Broadwell Realty Services, Inc. v. Fidelity & Cas. Co.,* 218 N.J.Super. 516, 522–25, 528 A.2d 76, 79–80 (Ct.App.Div.1987). Thus, our dis-

---

1. 38 M.R.S.A. § 562(10) (1989):

"Responsible party" means any one or more of the following persons:
A. The owner or operator of the underground oil storage facility where a prohibited discharge has occurred;
B. The person to whom the underground oil storage facility where a prohibited discharge has occurred is registered;
C. Any person other than those identified in paragraph A or B who caused the prohibited discharge of oil or who has custody or control of the oil at the time of the prohibited discharge; or
D. Any person who owned or operated the underground oil storage facility from the time any oil, petroleum products or their by-products arrived there.
As set out in this subsection, "responsible party" does not include a person who can demonstrate by a preponderance of the evidence that that person neither knew nor had reason to know of the existence of an underground oil storage facility.

cussion focuses on the language of the insurance contract.

## INDEMNIFICATION

■ The insurance contract between Patrons Oxford and the Maroises provides that the insurer:

> will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage....[2]

Some courts have construed this or similar language as limiting coverage to traditional common law damages recovered by third parties, thereby excluding coverage for equitable relief such as clean-up efforts or restoration, *see, e.g., Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979 (4th Cir.1988) (South Carolina law); *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977 (8th Cir.) (en banc) (Missouri law), *cert. denied,* — U.S. —, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Maryland Cas. Co. v. Armco Inc.*, 822 F.2d 1348 (4th Cir.1987) (Maryland law), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). Other courts have read the language to extend coverage to any expense an insured incurs to mitigate or prevent property damage, *see, e.g., Avondale Industries Inc. v. Travelers Indemnity Co.*, 887 F.2d 1200 (2d Cir.1989); *C.D. Spangler Construction Co. v. Industrial Crankshaft and Engineering Co.*, 326 N.C. 133, 388 S.E.2d 557 (1990); *Broadwell Realty Services, Inc. v. Fidelity & Cas. Co.*, 218 N.J.Super. 516, 528 A.2d 76 (Ct.App.Div. 1987). Amounts sought by a state or federal agency to reimburse that agency for clean-up costs have been variously categorized as covered damages, *Avondale Industries Inc. v. Travelers Indemnity Co.*, 887 F.2d 1200 (2d Cir.1989); *Township of Gloucester v. Maryland Cas. Co.*, 668

F.Supp. 394 (D.N.J.1987), or uncovered equitable relief, *Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979 (4th Cir.1988); *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co. Inc.*, 842 F.2d 977 (8th Cir.) (en banc), *cert. denied,* — U.S. —, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Maryland Cas. Co. v. Armco Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

The Patrons Oxford contract language provides coverage not for "property damage" itself, but for "sums which the insured shall become legally obligated to *pay as damages* because of ... property damage" (emphasis supplied). In this case, the Maroises are not yet legally obligated to pay any sums (except their attorney fees, the responsibility for which is determined by the duty to defend). Although they may eventually spend money if Lathe Fuel's efforts are unsuccessful, the money spent to meet the State's demands would be first for a remedial plan, and then, if the plan were accepted, for measures satisfactory to the DEP to prevent contaminated ground water from migrating, restore ground water quality and restore or replace contaminated ground water supplies. Such amounts may be substantial and may effectively alleviate or prevent property damage to others, but we do not believe the "ordinarily intelligent insured," engaged in a "more than casual reading of the policy," *Union Mutual Fire Ins. Co. v. Commercial Union Ins. Co.*, 521 A.2d 308, 310 (Me.1987), would consider them to be "sums which the insured [is] legally obligated to pay as damages." Instead, they are the expenses the Maroises may be required to incur to halt continuing pollution and property damage.[3] There may be a substantial difference between these remedial costs and the amount of damages the

---

**2.** The policy defines "property damage" as:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Coverage does not extend to "property damage to ... property owned or occupied by or rented to the insured...." The word "damages" is not a defined term in the contract.

**3.** If the Maroises fail to act, the DEP may undertake clean-up action under 38 M.R.S.A. § 568 (1989). If it does so, its expenses are initially charged against the Ground Water Oil Clean-up Fund, then recovered from a responsible party like the Maroises. 38 M.R.S.A. §§ 569(6), 570

Maroises would have to pay to property owners for damages to their property. It is the latter expenditure upon which the parties have contracted and upon which the insurance premium is based.

Prior to the past several years, there had been no suggestion that this insurance contract language providing coverage for sums paid "as damages" would cover anything other than amounts that might be awarded against an insured to recompense a third party for damage to its property.[4] Instead, the case law was to the contrary, *see Aetna Cas. & Surety Co. v. Hanna*, 224 F.2d 499 (5th Cir.1955); *Desrochers v. New York Cas. Co.*, 99 N.H. 129, 106 A.2d 196 (1954). Recently, however, some courts have argued that lay persons reading an insurance contract do not understand the traditional meaning of sums paid "as damages."[5] Applying rules of construction that favor insureds over insurers, these courts have found coverage for clean-up costs undertaken by the insured in response to governmental demands. We do not adopt such reasoning.[6]

There are many words, phrases or paragraphs in a standard insurance contract that a first time reader does not understand. That circumstance does not justify excising such provisions from the contract.[7] Only when they are ambiguous is their interpretation affected, and the insured given the benefit of the doubt. *See Allstate Ins. Co. v. Elwell*, 513 A.2d 269, 271 (Me.1986). Previous judicial interpretations made clear the meaning of the words "pay as damages" when used in an insurance contract. *See Aetna Cas. & Surety Co. v. Hanna*, 224 F.2d 499 (5th Cir.1955); *Desrochers v. New York Cas. Co.*, 99 N.H. 129, 106 A.2d 196 (1954). Ambiguity (as opposed to outright lack of understanding) is created only by converting an insured's hope or assumption that every out-of-pocket payment is covered into a part of the contract language.[8]

We conclude that in the current posture of this case, the Maroises are not confronted with any liability for damages. We therefore reject their appeal seeking great-

(1989). Such sums expended by the DEP, however, are for pollution control, not for property damage. The statute explicitly recognizes a separate treatment for property damage. If third parties suffer property damage, they may seek damages from the Fund, 38 M.R.S.A. § 569(2–A) (1989), amounts for which the Maroises would ultimately be responsible, 38 M.R.S.A. § 569(6) (1989), and which would presumably be covered under the policy. The stipulated facts make no reference to even a threat of such a property damage claim.

4. The contract language appears to go back many years, *see* Chester, Rodbury & Smith, *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability*, 18 Rutgers L.J. 9, 15–16 (1986), long before remedial measures like those at issue here were contemplated. Indeed, the only focus of the State's order is to achieve a clean-up regardless of the insurance contract's concerns for whether property damage to third parties (covered) or to the Maroises (not covered) has occurred.

5. Common dictionary definitions of "damages" are not very helpful. We observe that of the range of definitions collected in other opinions, many support a restrictive reading, *see e.g.*, *Broadwell Realty Services*, 528 A.2d at 82 ("the word 'damages' generally refers to a pecuniary compensation or indemnity ... and ... the cost of complying with an injunctive decree does not ordinarily fall within this definition"); *Boeing*

*Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d at 520–21 (dissenting opinion) (surveying 19 dictionaries and finding that they distinguish damages from restitution and that use of the term to include costs or expense is almost universally labeled informal, colloquial or slang).

6. We find no guidance on the question before us from *White v. Republic Fire Ins. Co.*, 57 Me. 91 (1869). That case awarded coverage under a fire insurance policy for goods that were damaged when they were moved to avoid a fire and for the expense of moving them. The opinion nowhere reveals the insurance policy language and the primary loss was damage to the goods, not the cost incurred in attempting to avoid the damage.

7. Only by completely eliminating the phrase "as damages" can coverage be found. The contract would then require the insurer to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay ... because of ... property damage." That would support coverage, but that is not the language of this contract.

8. Our approach here is consistent with our analysis in *Braley v. Berkshire Mut. Ins. Co.*, 440 A.2d 359, 361–62 (Me.1982), where we construed "damages ... for bodily injury" in an uninsured motorist policy not to provide coverage for punitive damages.

er coverage than the Superior Court found. Our analysis might result in somewhat different coverage than the Superior Court found with its on-premises/off-premises distinction, but we do not address that issue. Because the insurance company has not cross-appealed, it is bound by the Superior Court's judgment as to its responsibilities vis-a-vis the Maroises.[9]

## DUTY TO DEFEND

■ The insurance contract language provides that the insurer:

"shall have the ... duty to defend any suit against the insured seeking damages on account of such ... property damage...."

Under Maine's statutes, the DEP cannot recover damages in the administrative proceeding it has brought, but can only compel a clean-up. 38 M.R.S.A. § 568 (1989). If the State ultimately has to make payments from the Ground Water Clean-up Fund to abate the pollution, it may refer the matter to the attorney general for collection, including interest and penalties against any "responsible party." 38 M.R.S.A. §§ 568(4)(B), 569(6), 570 (1989). There is no suggestion in the record that such a proceeding is contemplated. Alternatively, third parties could make a claim against the State for damages they suffer from the migration of contaminated ground water and the State could then sue landowners like the Maroises for reimbursement, 38 M.R.S.A. § 569(2–A) (1989). That also has not occurred in this case. Thus, there has been no "suit against the insured seeking damages," and the insurer has no present duty to defend.

The entry is:

Judgment affirmed.

All concurring.

---

9. We do not reach any different result by applying the State's analysis that it is "trustee of the ground water on behalf of the citizens of this State." The State has not at this point sought damages for injury to any proprietary interests. Instead, its actions in the administrative proceeding represent an exercise of the police power. The costs of responding to the State's police power are not customarily covered by insurance.